UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MOLLIE WILLIAMS,

      Plaintiff,

v.

     Case No. 23-cv-11944

AMAZON.COM SERVICES LLC, et al.,

     Honorable Robert J. White

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 30);
DENYING PLAINTIFF'S MOTION FOR AN ADVERSE PRESUMPTION
OR ADVERSE JURY INSTRUCTION AGAINST DEFENDANT (ECF No.
33); AND DENYING DEFENDANT'S MOTION TO EXTEND EXPERT
DISCOVERY DEADLINES (ECF No. 34)**

---

Plaintiff Mollie Williams sued Defendant Amazon.com Services LLC (Amazon) in state court for employment discrimination based on her sexuality.[1] (ECF No. 1-1).  Specifically, Williams brought claims against Amazon for (1) disparate treatment, (2) hostile work environment, and (3) retaliation, all in violation of the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et*

---

[1] Although Williams named Dion Bryant Carter, Jr. as a defendant, it does not appear that Williams ever served Carter. (ECF No. 10, PageID.210).  Williams also did not allege any actionable claims against Carter in her complaint. (ECF No. 1-1, PageID.35–37).

*seq.* (ELCRA). (*Id.* at PageID.35–37). Amazon removed the complaint to federal court on diversity jurisdiction grounds. (ECF No. 1, PageID.15).

There are three motions presently before the Court. First, Amazon moved for summary judgment on all of Williams' claims. (ECF No. 30). Second, Williams moved for an adverse presumption or adverse jury instruction against Amazon given Amazon's alleged spoliation or destruction of evidence. (ECF No. 33). Third, Amazon moved to extend expert discovery deadlines. (ECF No. 34). For the reasons that follow, the Court will; grant in part and deny in part Amazon's motion for summary judgment; deny Williams' motion for an adverse presumption or adverse jury instruction against Amazon; and deny Amazon's motion to extend expert discovery deadlines.

## I.    Background

Williams joined Amazon at its SSD fulfillment center in Hazel Park, Michigan (the Fulfillment Center) as an SSD Associate on May 30, 2021. (ECF No. 30-2, PageID.364, 367; ECF No. 30-3, PageID.643). Williams referred to herself more informally as a "warehouse worker." (ECF No. 30-2, PageID.364). As part of her on-boarding, Williams acknowledged Amazon's "Workplace Harassment & Equal Employment Opportunity Policy." (ECF No. 30-5, PageID.655). By acknowledging the policy, Williams understood that that if she experienced discrimination, harassment, or retaliation at work, then she "should immediately" report the

2

concerns to "a human resources representative, [her] supervisor, any other manager, [or] the Legal Department." (*Id.*).  Williams could also call the Amazon Ethics Line to "raise an anonymous complaint at any time." (*Id.*).

The Fulfillment Center has four departments: ICQA (count), outbound, inbound, and dispatch. (ECF No. 30-7, PageID.673).  Williams initially rotated through the different departments at the Fulfillment Center. (ECF No. 30-2, PageID.375).  But in the summer of 2021, Williams suffered a foot injury that required surgery and time off from work. (*Id.* at PageID.378–80).  Williams returned to work sometime in January 2022.  Although she did not request accommodation at that time, her surgeon indicated at a subsequent appointment that to regain full use of her leg, she needed to limit her mobility at work. (*Id.* at PageID.379).  Ultimately, in November 2022, her doctor submitted a note to Amazon restricting Williams from standing for more than four hours a day. (ECF No. 30-23, PageID.1802).  Amazon determined that, based on Williams' restrictions, she could "work in dispatch at the exit door" and in count with a "chair as needed." (ECF No. 30-21, PageID.1793).

As part of its operations, Amazon contracts with third-party delivery partners (Flex Drivers) to make regional and local deliveries. (ECF No. 30-21, PageID.1793).  Flex Drivers can sign up through a smartphone app to deliver packages from the Fulfillment Center. (*Id.* at PageID.1793–94).  Once a Flex Driver accepts a delivery, he or she will use their personal vehicle to pick up packages from the Fulfillment

Center and deliver them to customers. (*Id.* at PageID.1794).  Amazon considers Flex Drivers independent contractors and not employees. (*Id.* at PageID.1793–94). Sometime in 2022, the Fulfillment Center made employees at dispatch responsible for verifying that Flex Drivers were leaving with the packages that were assigned to them. (*Id.* at PageID.1794–95).   The employee at dispatch would verify the information by confirming that the code on the Flex Driver's phone matched that of the packages the Flex Driver was leaving with. (*Id.*).

Williams testified that while working in dispatch, she suffered "intense" harassment from Flex Drivers. (ECF No. 30-2, PageID.427).  That is, Flex Drivers would call her homophobic slurs "maybe once or twice a week" and make other threats to her. (*Id.* at PageID.401, 427).  Although Williams did not formally report most instances of discriminatory conduct and instead opted to record them in her phone's notes app, (*id.* at PageID.401–02, 424–25), Amazon stated that it was aware of three different incidents of harassment against Williams, (ECF No. 30, PageID.313–17).

The first incident occurred when a Flex Driver tried to park in front of a ramp outside of the Fulfillment Center. (ECF No. 30-2, PageID.414).  At the time, Williams was pulling carts onto the ramp; after Williams told the Flex Driver he could not park there, he became aggressive. (*Id.* at PageID.414–15).  He followed Williams into the warehouse, cursed at her, and called her a "dyke bitch." (*Id.* at

PageID.415–16).  Another employee intervened, stepped between Williams and the Flex Driver, and told the Flex Driver to leave. (*Id.* at PageID.417).   Williams believed that she reported the incident to her supervisor at the time, and that the employee who intervened informed the manager of what had happened. (*Id.* at PageID.417–18).  Williams was unable to identify the Flex Driver involved. (*Id.* at PageID.422).   Afterwards, Williams continued to see the Flex Driver at the Fulfillment Center "daily", but she purposefully avoided him. (*Id.* at PageID.422–23).

The second incident occurred on September 1, 2022. (*Id.* at PageID.453). That day, Williams asked a Flex Driver named Dion Carter, Jr. to take his assigned packages outside; at the time, Carter had them spread all over the Fulfillment Center's floor.  (*Id.* at PageID.453–54).  Carter responded by calling Williams a "dyke," "bulldaggers," saying he thought she was a man, and even threatening to kill her. (*Id.* at PageID.454–55).  Another employee reported the incident, and Williams later discussed it with her supervisor, Schanee Dubey. (*Id.* at PageID.456). Once informed, Dubey escalated the complaint immediately to loss prevention and entered a ticket. (ECF No. 30-7, PageID.860–61, 882).  In the ticket, Dubey wrote that she did not want Carter back in the building. (ECF No. 30-13, PageID.1272). Loss Prevention Specialist Reggie Swims reviewed the ticket and informed security

5

to call police if Carter ever came back. (*Id.* at PageID.1273).  Williams never saw Carter again. (ECF No. 30-2, PageID.463).

The third incident reported to Amazon involved Williams and a female Flex Driver. (*Id.* at PageID.511–12).  The incident took place on October 6, 2022. (ECF No. 30-6, PageID.657).  Williams submitted a written statement to Amazon summarizing the incident. (*Id.*).  Williams wrote that the Flex Driver started cursing Williams out and "repeated offensive homophobic derogatory words" to Williams for "no real reason." (*Id.*).  Williams tried to ignore her but the Flex Driver "continued to harass and berate [her] for no real reason." (*Id.*).  Williams testified that she engaged with the Flex Driver and called her a "bitch." (*Id.* at PageID.480–82).

When the situation first started to escalate, another employee present, Ashley Thomas, went to retrieve a manager. (ECF No. 30-16, PageID.1750).  Dubey came to assess the situation, and made the Flex Driver leave. (*Id.* at PageID.1753).  Thomas entered a ticket for the incident to "get the driver out of there." (*Id.* at PageID.1720).  In response to Thomas' ticket, Swims told security to call police if that Flex Driver ever returned. (ECF No. 30-13, PageID.1307).  Williams never saw that driver again, (ECF No. 30-2, PageID.527), but she did receive a written warning for engaging with that Flex Driver. (ECF No. 30-8, PageID.1010).

Outside of these incidents, Williams also believed that Amazon discriminated against her in its enforcement of the bag policy. (ECF No. 30-2, PageID.534). Amazon's bag policy requires that employees use clear bags while working on the floor. (*Id.* at PageID.544–45).   To effectuate the policy, Amazon provided each employee with a clear backpack upon their start. (*Id.* at PageID.544).  But according to Williams, managers at Amazon routinely stopped and prevented her, and not others, from bringing her non-see-through backpack to work. (*Id.* at PageID.534–36).  And even when Williams "specifically bought a backpack that was see through" from Amazon's website, the discriminatory treatment continued to occur. (*Id.* at PageID.535).  Williams opined that she was singled out because of her sexuality. (*Id.* at PageID.534).   In contrast, Amazon's Human Resources (HR) representative Marcy McCormick testified that the bag policy was "impacting other employees" and "not something targeted and directed towards [Williams]." (ECF No. 30-15, PageID.1612).  Amazon knew the policy was inconsistently applied across the warehouse and was taking steps to remedy the problem. (*Id.*).

Williams made several direct complaints to the ethics committee about the discriminatory treatment she allegedly faced. On October 27, 2022, Williams submitted an ethics complaint related to the September 1 incident with Carter. (ECF No. 30-11, PageID.1244).  But Williams testified that before she filed her complaint, she met directly with HR Representative Alison Balcueva and Dubey. (ECF No. 32-

2, PageID.1902).  At the meeting, Williams expressed frustration with Balcueva's and Dubey's failure to address the harassment and told them that "neither one of you guys have did anything to help me." (*Id.*).  Williams testified that she went to the ethics committee following that meeting. (*Id.* at PageID.1903).  Afterwards, Williams believed that Balcueva's and Dubey's "whole attitude changed" toward her. (*Id.* at PageID.1902).  They became "very rude to [Williams]" and Williams felt that she now had a "target on [her] back" from the "point on when [she] went to the ethics committee." (*Id.*).

During that same pre-complaint meeting, Balcueva suggested that Williams move from dispatch to count to avoid Flex Drivers. (ECF No. 30-2, PageID.402–03).  But Williams objected to being moved as a consequence of other people's inappropriate behavior. (*Id.* at PageID.403).  Despite Williams' objections, "[Dubey] sent [Williams] to the corner of the warehouse to do meaningless work" in count. (*Id.* at PageID.562).  Williams testified that Dubey moved her "directly after . . . filing that complaint." (*Id.*).

Balcueva ultimately served as the HR Case Owner for Williams' October 27 complaint. (ECF No. 30-11, PageID.1244).  As part of the investigation, Balcueva interviewed Williams about her complaint. (*Id.*).  Because Williams did not raise any new instances of misconduct in her complaint or at the meeting, Balcueva believed

the situation was resolved and closed the complaint for lack of evidence. (*Id.*; ECF No. 30-8, PageID.1152).

About a month later, on December 5, 2022, Williams submitted another ethics line complaint. (ECF No. 30-25, PageID.1806). Williams alleged that neither Dubey nor Balcueva had done anything to address the harassment she faced by Flex Drivers because of her sexuality. (*Id.*). Williams updated her complaint on December 7, 2022 to request that she be removed from working under Dubey as soon as possible. (*Id.*). Williams stated that Dubey was bullying and intimidating her. (*Id.*).

Shortly thereafter, on December 15, 2022, Dubey had two "seek-to-understand" conversations with Williams based on Williams' alleged failure to properly check Flex Drivers' routes. (ECF No. 30-7, PageID.835–37; ECF No. 30-2, PageID.565–66). Even though Dubey had two STU conversations with Williams, Dubey testified that Williams still refused to check driver routes. (ECF No. 30-7, PageID.896). Dubey therefore entered a written warning for insubordination. (*Id.* at PageID.895–96). In her deposition, however, Dubey admitted that her STUs were "not completely" accurate and failed to reflect Dubey's instruction to Williams to let the Flex Drivers that ignore her requests go. (ECF No. 32-5, PageID.2136–37).

Balcueva reviewed Dubey's written warning as well as time-stamped video and photo evidence of the incident. (ECF No. 30-19, PageID.1785–86). Balcueva

believed the evidence confirmed Williams' insubordination. (ECF No. 30-8, PageID.1092–93). Williams did not check the Flex Drivers' routes as required, nor did she correct her behavior even after multiple conversations with Dubey. (*Id.* at PageID.1093). Swims and Area Manager Mike Hochberg concurred with Balcueva's decision based on their own review of the footage. (ECF No. 30-13, PageID.1311; ECF No. 30-14, PageID.1409–10).

Amazon classifies insubordination as an "extremely serious," Category 1 offense that may result in termination. (ECF No. 30-4, PageID.652). After reviewing the written report and the footage, Balcueva and site leader Matt Hall decided to terminate Williams, effective December 19, 2022. (ECF No. 30-8, PageID.1090, 1099, 1106–08, 1120; ECF No. 30-12, PageID.1254; ECF No. 30-21, PageID.1796). Hall was unaware of Williams' sexual orientation or the fact that she had filed any ethics complaints at the time of her termination. (ECF No. 30-21, PageID.1796). Balcueva and Dubey claimed they did not know of Williams' December 5, 2022 complaint at the time of her termination. (ECF No. 30-17, PageID.1777; ECF No. 30-19, PageID.1786).

In contrast, former SSD Associate, Rodrick Owens, reviewed the video of Williams supposedly not checking routes and testified that Williams did nothing wrong. (ECF No. 32-4, PageID.2048–49). All Williams had to do was check the driver's phone for the route number, which Owens saw her do. (*Id.* at PageID.2048).

Owens also testified that Amazon retaliated "immediately" against employees that made complaints. (*Id.* at PageID.2045).

Williams believed the STUs were retaliation for her ethics complaint, considering how she was "constantly praised for how well" she did at the dispatch door before then. (ECF No. 32-2, PageID.1947). Williams suspected something was amiss when she was moved back to dispatch from cycle count and Dubey "kept coming" over to her to ask if she was checking drivers and "just nitpicking." (*Id.* at PageID.1945). Williams told Dubey the drivers were ignoring her; Dubey said to just let them go if they did that. (*Id.*). Although another employee witnessed the conversation, Amazon never followed up with them about what she heard Dubey say to Williams. (*Id.* at PageID.1945–46). Williams appealed her termination. (*Id.* at PageID.1946). Amazon conducted an appeal hearing that lasted five-to-ten minutes, at which it did not allow Williams to present witnesses. (*Id.*). Amazon denied Williams' appeal. (*Id.*).

## II. Legal Standard

A party may move for summary judgment on any claim or defense. Fed. R. Civ. P. 56(a). The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* In analyzing a summary judgment motion, "'the court must view the evidence in the light most favorable to the non-moving party

and draw all reasonable inferences in its favor.'" *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Sierra Brokerage*, 712 F.3d at 327 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Overall, the court's inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.   Analysis

The ELCRA prohibits an employer from discharging or otherwise discriminating against an individual "with respect to employment, compensation, or a term, condition, or privilege of employment" based on that individual's sex or sexual orientation. MCL § 37.2202(1)(a). Courts analyze ELCRA claims "'under the same evidentiary framework used in Title VII cases.'" *Gibson v. MGM Grand Detroit, L.L.C.*, 815 Fed. App'x 48, 55 (6th Cir. 2020) (quoting *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652 (6th Cir. 2012)). Here, Williams asserted

three separate claims under the ELCRA for (1) disparate treatment; (2) hostile work environment; and (3) retaliation. (ECF No. 1-1, PageID.35–37).

According to Amazon, there is no genuine dispute that the facts do not support Williams' claims. (ECF No. 30, PageID.307). In response, Williams argued that she suffered disparate treatment in the form of selective enforcement of Amazon's bag policy and through the repeated homophobic remarks made by Flex Drivers. (ECF No. 32, PageID.1877–79). And because Amazon did not adequately address the harassment Williams faced, and in fact retaliated against her for reporting it, Amazon is not entitled to judgment as a matter of law on the retaliation and hostile work environment claims. (*Id.* at PageID.1871–76, 1879–85). Overall, Williams asserted that material disputes of fact exist as to each of her claims such that the case must proceed to trial.

### A. Disparate Treatment

Amazon identified three bases for Williams' disparate treatment claim: (1) enforcement of the bag policy; (2) the written warning Williams received for the October 6, 2022 incident with the female Flex Driver; and (3) Williams' termination. (ECF No. 30, PageID.323). Williams added her reassignment to count as another instance of disparate treatment. (ECF No. 32, PageID.1878). Amazon argued that these occurrences are insufficient to state a prima facie disparate treatment claim as a matter of law. (ECF No. 30, PageID.323; ECF No. 37, PageID.2512–13). Williams

13

disagreed; she claimed the facts establish both direct and circumstantial evidence of discrimination. (ECF No. 32, PageID.1877–78).

When a plaintiff alleges disparate treatment, liability depends on whether the protected trait "actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (citation omitted). That is, the plaintiff's protected trait must have actually played a role in the employer's decision-making process and "had a determinative influence on the outcome." *Id.* For a disparate treatment claim to survive, a plaintiff "must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003).

Direct evidence speaks for itself. It is "evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543–44 (6th Cir. 2008)); *see also Johnson*, 319 F.3d at 865 ("direct evidence of discrimination does not require a factfinder to draw any inferences"). Here, Williams proffered the homophobic slurs and gender-based insults made by Flex Drivers as direct evidence of discrimination. (ECF No. 32, PageID.1877–78). Although the comments are deplorable, they do not suffice as direct evidence, since

14

the Flex Drivers had no say in the terms or conditions of Williams' employment or her termination. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) ("comments made by individuals who are not involved in the decision-making process regarding plaintiff's employment do not constitute direct evidence of discrimination"); *see also Thompson v. City of Lansing*, 410 Fed. App'x 922, 929 (6th Cir. 2011) (citing *Carter*).

Still, the lack of direct evidence is not dispositive of Williams' claims. When a claim's validity depends on circumstantial evidence, courts use the *McDonnell-Douglas* "burden-shifting framework" to analyze the claim. *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 895 (6th Cir. 2024) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 (1973)). The *McDonnell-Douglas* framework creates a burden of production, not persuasion, and establishes the order for presentation of proof in discriminatory-treatment cases. *Reeves*, 530 U.S. at 142. The court does not take credibility into account in its *McDonnell-Douglas* analysis. *Id.*

Under *McDonnell Douglas*, the plaintiff must first "establish a prima facie case of discrimination." *Id.* To make a prima facie showing of discrimination, the plaintiff must demonstrate that (1) they are a "member of a protected class"; (2) they suffered an "adverse employment action"; (3) they were qualified for the position; and (4) "a similarly-situated employee outside the protected class or classes was treated more favorably." *Dodd v. Donahoe*, 715 F.3d 151, 156 (6th Cir. 2013); *see*

*also Spellman v. Ohio Dep't of Trans.*, 244 F. Supp. 3d 686, 701 (S.D. Ohio 2017) (applying same test to claim for discrimination based on sexual orientation). Once satisfied, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for taking the challenged action." *Johnson*, 319 F.3d at 866 (citation omitted). If the defendant meets this burden, "the plaintiff must then prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.* (citation omitted).

Amazon did not challenge Williams' status as a member of a protected class, nor did it argue that Williams was unqualified for her position. Instead, Amazon focused on whether Williams actually suffered an adverse employment action and whether other similarly situated employees outside of the class were treated more favorably. (ECF No. 30, PageID.324–26). Amazon argued that the enforcement of the bag policy and the written warning were not adverse actions redressable by the ELCRA. (*Id.* at PageID.324–25). Likewise, Williams failed to offer any appropriate comparators to demonstrate that Amazon treated her differently than others because of her sexual orientation. (*Id.* at PageID.325–26). Amazon thus asked the Court to deny Williams' disparate treatment claims as a matter of law.

### 1.    Adverse Actions

The Court finds that the enforcement of the bag policy and the written warning were not adverse actions. To state a claim for discrimination, the plaintiff "must

16

show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 354–55 (2024). Accordingly, an action becomes adverse when it brings "about some disadvantageous change" or otherwise leaves an employee "worse off." *Id.* at 354, 359 (citation omitted). Actionable harms typically arise when an employee "suffers a loss of pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some other actual and unfavorable change in job status." *Fox v. Universal Logistics Holding, Inc.*, No. 2:23-cv-13135, 2026 WL 751896, at *5 (E.D. Mich. Mar. 17, 2026) (quoting *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 786 (6th Cir. 2024)). The harm caused need not meet a certain threshold of seriousness or significance. *Muldrow*, 601 U.S. at 355.

Williams claimed that Amazon harmed her by enforcing its see-through bag policy as to her but not others. (ECF No. 32, PageID.1878). But Williams did not explain "how or why" enforcement of the warehouse-wide policy left her worse off in the terms and conditions of her employment. *See Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171, at *5 (6th Cir. July 16, 2024). The only harm the Court can discern is that Williams was limited to a policy-compliant bag whereas other employees seemingly used whatever bags they wanted. (ECF No. 30-2, PageID.554). And while water bottles "kept falling out" of Williams' policy-compliant bag, the other employees' bags securely held water bottles. (*Id.*). Beyond

the inconvenience of water bottles falling out of her bag more often, however, it is not clear that the type of bag Williams brought to work made it "harder to do her job" or detrimentally affected her working conditions. *Williams*, 2024 WL 3427171, at *5. And because a "mere inconvenience" is not actionable, *Fox*, 2026 WL 751896, at *5, the effects of the bag policy enforcement cannot support a prima facie disparate treatment claim.

Williams also failed to show that the written warning constituted an adverse action. Based on the facts presented, the warning was just that – a warning. It did not, on its own, harm an identifiable term or condition of Williams' employment. At least, Williams did not point to evidence of any harm occurring as the direct result of that warning. Given that the written warning is not "independently actionable," then, it cannot serve as the basis for a disparate treatment claim. *See McNeal*, 117 F.4th at 903 ("Only discipline causing 'some harm respecting an identifiable term or condition of employment' is actionable on its own.") (quoting *Muldrow*, 601 U.S. at 355).

But a reasonable juror could find that Williams' reassignment and termination were adverse actions. To start, Williams' termination is the quintessential adverse action; Amazon did not dispute this. As for her reassignment, Williams testified that she was moved from dispatch to cycle count shortly after filing a discrimination complaint with the ethics committee. (ECF No. 32-2, PageID.1944). Cycle count

18

proved more challenging for Williams given her medical accommodation. (ECF No. 32-2, PageID.1905–06).   And Amazon placed Williams in cycle count over her objections. (*Id.* at PageID.1921).   Based on Williams' testimony, and construing the facts in her favor, a material dispute of fact exists as to whether the reassignment harmed her sufficiently to state a prima facie case.   So although Williams cannot state disparate treatment claims for the bag policy enforcement and the written warning as a matter of law, the Court can proceed with analyzing her reassignment and termination under the *McDonnell-Douglas* framework.

### 2.   Similarly Situated Employees

But Williams failed to identify appropriate comparators for any of her disparate treatment claims as required by the *McDonnell-Douglas* framework.   "To establish that a non-protected employee is an appropriate comparator, 'the plaintiff [must] demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects.'" *Dickens v. Interstate Brands Corp.*, 384 Fed. App'x 465, 468 (6th Cir. 2010) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)).   "In the disciplinary context . . . this requires that the plaintiff and the proposed comparator have engaged in acts of 'comparable seriousness.'" *Dickens*, 384 Fed. App'x at 468 (citation omitted).   Since the Court already found that enforcement of the bag policy and the written warning did not

19

qualify as adverse actions, the Court need not address the parties' arguments as they relate to proposed comparators for this claim.

As for her reassignment and termination, Williams did not show that she was treated differently than other non-protected employees at Amazon. For example, she did not reference other non-protected employees who made complaints but were not reassigned, nor did she point to employees that failed to follow dispatch protocol but were not terminated. Without appropriate comparators, her remaining disparate treatment allegations are doomed. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion'") (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). The Court will therefore grant summary judgment in favor of Amazon on Count I.

### B. Retaliation

Amazon argued that Williams' retaliation claim fails as a matter of law because Amazon had legitimate, non-discriminatory reasons for its actions. (ECF No. 30, PageID.326–29). Williams responded that there is a material dispute of fact as to whether Amazon retaliated against Williams for reporting the harassment and discrimination she faced because of her sexual orientation. (ECF No. 32, PageID.1870–71). At the crux of Williams' retaliation claim is her termination.

Williams claimed the events leading up to her termination serve as evidence of Amazon's retaliatory animus. (*Id.* at PageID.1872).

The ELCRA makes it illegal to "[r]etaliate or discriminate against a person . . . because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." MCL § 37.2701(a).  To make a prima facie showing of retaliation, an employee must demonstrate that (1) she "engaged in protected activity"; (2) "the employer knew of the exercise of the protected right"; (3) "an adverse employment action was subsequently taken against the employee"; and (4) "there was a causal connection between the protected activity and the adverse employment action." *Laughlin v. City of Cleveland*, 633 Fed. App'x 312, 315 (6th Cir. 2015) (citation omitted).  To establish causation, the plaintiff must show that her protected activity "'was a but-for cause of the alleged adverse action by the employer.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

After an employee establishes a prima facie case of retaliation, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Laughlin*, 633 Fed. App'x at 315 (citation omitted).  "If the employer meets this burden, the employee must demonstrate that the legitimate reason offered by the employer was a pretext designed to mask retaliation." *Id.* (citation omitted).  In the Sixth Circuit, an employee can show pretext if (1) "the proffered reasons had no

21

basis in fact"; (2) "the proffered reasons did not actually motivate the employer's action"; or (3) the proffered reasons "were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

Amazon claimed Williams' termination was not retaliatory because (1) Amazon had legitimate reasons for reassigning Williams; (2) the decisionmakers were unaware of her December complaint at the time of her termination; and (3) Amazon ultimately had cause to fire Williams. (ECF No. 30, PageID.326–29). Williams responded that Amazon's explanation for her termination was false and pretextual. (ECF No. 32, PageID.1876). That is, a reasonable juror could find the termination resulted from earlier-in-time complaints Williams made about the harassment, not just the December complaint, and that any other claimed justification was pretextual (*Id.* at PageID.1876–77).

From Amazon's perspective, the catalyst for Williams' termination was two "seek-to-understand" (STU) conversations she had with Dubey. (ECF No. 30, PageID.318–21, 330–32). Both conversations involved Williams' alleged failure to check flex drivers' routes before letting them leave. (*Id.* at PageID.330–32). After Dubey had multiple STUs with Williams about the same issue, she entered a written warning for insubordination. (ECF No. 30-7, PageID.895–96). Because of the insubordinate conduct, Amazon claimed it had a legitimate reason to fire Williams. (ECF No. 30, PageID.331). In addition, the relevant decision-makers, Dubey and

22

Balcueva, had no knowledge of Williams' December complaint. (*Id.*). Without such knowledge, Williams cannot state a prima facie claim for retaliation, (*Id.*). *See Proffitt v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 150 Fed. App'x 439, 442 (6th Cir. 2005) ("[T]he decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation.").

But enough evidence exists to deny summary judgment, exclusive of the relevant decision-makers' knowledge of the December 2022 complaint. To start, Williams had lodged complaints with Dubey and Balcueva before the December 2022 complaint. Sometime around October 2022, Williams met with Balcueva and Dubey about their failure to address Williams' concerns and the harassment she faced. (ECF No. 32-2, PageID.1902). Williams then submitted a formal ethics complaint on October 27, 2022. (ECF No. 30-11, PageID.1244). Balcueva served as the case owner of the complaint and interviewed Williams in connection with her investigation. (*Id.*). At that point, Balcueva and Dubey knew that Williams had engaged in protected conduct regarding the harassment from Flex Drivers.

After the meeting and her submission of the complaint, Williams noticed Dubey's and Balcueva's attitude shift toward her. (ECF No. 32-2, PageID.1902). Williams felt as if she now had a target on her back. (*Id.*). That feeling was not unfounded. That is, shortly after that meeting, Dubey moved Williams to count over Williams' objections. (ECF No. 30-2, PageID.402–03). And when Dubey eventually

moved Williams back to dispatch, Dubey began "nitpicking" Williams' performance. (ECF No. 32-2, PageID.1944–45). Williams was fired within days of her return to dispatch based on Dubey's STUs. (*Id.* at PageID.1944).

The meeting and the complaint occurred about a month and a half before Williams' termination. *See Jackson*, 999 F.3d at 349 ("Temporal proximity between the protected activity and the adverse employment action is an important category of circumstantial evidence."). Although Amazon argued that the only evidence in support of the pretext argument is the timing, that is not the case. (ECF No. 30, PageID.328–29). Williams testified that Dubey and Balcueva treated her differently after she raised her complaints both formally and informally; afterwards, Dubey almost immediately moved Williams to count despite Williams' preferences; when Williams returned to dispatch, Dubey scrutinized her performance heavily, to the point of writing her up for insubordination; and Dubey admitted in her deposition that she did, in fact, tell Williams to let drivers that did not stop go, contrary to her insubordination report. (ECF No. 30-2, PageID.402–03, 562; ECF No. 32-2, PageID.1902–03, 1945–46; ECF No. 30-7, PageID.905–06). The last fact suggests that Dubey intentionally omitted relevant information to make the write-up more damning than it originally was; clear evidence of a pretext designed to mask retaliation. The Court finds a material dispute of fact exists as to whether Williams' protected conduct caused her termination.

24

Other evidence indicates that Amazon's reason for terminating Williams was pretextual. Williams testified that she was "constantly praised for how well" she did at the dispatch door before her termination. (ECF No. 32-2, PageID.1947). That is not just Williams' opinion. Balcueva testified that Williams' site leader called Williams a "good worker" and a "hard worker." (ECF No. 30-8, PageID.1010). It is disputable, then, whether Williams acted insubordinately in the first place. Likewise, Owens testified that Amazon targeted employees who reported discrimination. (ECF No. 32-4, PageID.2045). Owens also disagreed that Williams was insubordinate in the video footage. (*Id.* at PageID.2048–49). Because at this juncture the Court cannot find Amazon's stated reason for terminating Williams legitimate, a material dispute exists as to whether Amazon retaliated against Williams for reporting harassing conduct by terminating her.

### C.   Hostile Work Environment

Amazon argued that Williams' hostile work environment claim cannot survive summary judgment because the unwelcome conduct did not interfere with Williams' work, Flex Drivers were not employees of Amazon, and Amazon took steps to prevent further discriminatory conduct. (ECF No. 30, PageID.332–35).

> To prevail on [a] claim of hostile work environment, [the] plaintiff must establish five elements: (1) plaintiff belonged to a protected group; (2) plaintiff was subjected to communication or conduct on the basis of sex; (3) plaintiff was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication

25

was intended to or in fact did substantially interfere with plaintiff's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Hamood v. Trinity Health Corp.*, --- N.W.3d ---, No. 364627, 2024 WL 5172396, at *6 (Mich. Ct. App. Dec. 19, 2024).

Here, Amazon claimed that the conduct at issue was not "severe or pervasive enough" to create "an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). That standard is an objective one. *Id.* Courts consider the totality of the circumstances in deciding whether a workplace is hostile. *Id.* at 23. Factors courts consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

Central to Amazon's argument is that only three incidents of harassment toward Williams were reported. (ECF No. 30, PageID.332–33). In support of its argument, Amazon cited case law that says a single instance of harassment is insufficient to form a hostile work environment claim, (*id.*). *See Myers v. Office Depot, Inc.*, No. 06-cv-11252, 2007 WL 2413087, at *5–6 (E.D. Mich. Aug. 21, 2007). Amazon expects the Court to infer that three instances of harassment do not establish a hostile work environment.

26

But Amazon cannot escape liability because Williams did not report every instance of harassing conduct.  An employee is not required to give actual notice of harassment to the employer; rather, "the test is whether the employer knew or should have known of the harassment." *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426 (2005).  The record reflects at least three instances of reported conduct, as well as numerous instances of unreported conduct that should have put Amazon on notice. Wiliams testified that she was subject to harassment "maybe once or twice a week" and took "notes" of occurrences in her notes app. (ECF No. 30-2, PageID.355, 425–27).  Although she did not share her notes with Amazon, Williams testified that she generally informed Dubey of all instances of discriminatory conduct. (*Id.* at PageID.425, 444–45).  In addition, other employees testified that flex drivers routinely harassed Williams. (ECF No. 32-3, PageID.2016; ECF No. 32-4, PageID.2042–43).  Hence, the harassment was not limited to a single isolated incident and instead appeared to occur often, whether or not it was formally reported. A reasonable jury could find that Amazon had notice that the conduct was severe and pervasive.

Regardless, the fact that Amazon actively worked to minimize or eliminate harassment warrants summary judgment in their favor.  "[I]n cases involving a hostile work environment claim, a plaintiff must show some *fault* on the part of the employer." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 312 (2000).  An employer is

liable for the discriminatory conduct of a non-employee, such as a contractor, if the employer "*intentionally* created or tolerated unequal working conditions." *Bivens v. Zep, Inc.*, 147 F.4th 635, 645 (6th Cir. 2025) (citation omitted). To make such a showing, the employee can provide evidence that the employer either desired to cause her harassment or was substantially certain that it would result from its actions. *Id.* For example, a hospital that required female nurses to work with a patient even though it was substantially certain that choice would result in further harassment could be held liable for hostile work environment. *Id.* at 647–48 (citing *Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 691–92 (7th Cir. 2005)).

But the evidence shows that Amazon took appropriate action when provided with the details of the discriminatory treatment Williams faced. First, Dubey immediately filed a report seeking to ban Carter from the building after Williams informed her that Carter threatened to kill her. (ECF No. 30-7, PageID.860–61). Testimony from Swims corroborated Dubey's testimony. (ECF No. 30-13, PageID.1273). Swims banned Carter from the building and told security to call police if he returned. (*Id.*). And, in fact, Swims stated that Dubey came to him after submitting the report to ensure that Williams "felt safe in the building" and that the "driver never came back to the building." (*Id.* at PageID.1305).

Another employee testified that Dubey "was siding" with Williams during the October 6 altercation. (ECF No. 30-16, PageID.1754). Swims reported that Flex

28

Driver to security and instructed them to call police if she ever came back. (ECF No. 30-13, PageID.1307).  Williams also testified that Dubey and Balcueva offered to move Williams from dispatch to avoid harassment from Flex Drivers. (ECF No. 30-2, PageID.571).  As for the first reported incident, Williams did not have the cart number to identify the Flex Driver involved, so Amazon was limited in its ability to respond. (*Id.* at PageID.422).  Otherwise, Amazon evidently acted when presented with specifics regarding the discriminatory conduct.  No reasonable juror could infer Amazon wanted or was certain that Williams would face harassment.  Instead, Amazon worked actively to find solutions.  As a result, Williams' hostile work environment claim fails as a matter of law.

### D.   Sanctions

In a separate motion, Williams moved for spoliation sanctions and for an adverse inference jury instruction against Amazon. (ECF No. 33, PageID.2350).  According to Williams, Amazon apparently failed to preserve the video footage of the events leading to Williams' termination, instead saving a single still image. (*Id.*).  Pursuant to Amazon's internal retention policy, the footage was deleted after 14 days. (*Id.*).  Williams alleged that Amazon selectively preserved the image, but not the video, despite its duty to retain electronically stored information (ESI) in anticipation of litigation. (*Id.*).  Because Williams needed that video to prove her claims and rebut

Amazon's justification for her termination, that decision warrants an adverse jury instruction. (*Id.* at PageID.2361).

In response, Amazon asked the Court to deny the motion for the following reasons. (ECF No. 38, PageID.2637).   First, Amazon had no duty to preserve evidence at the time the footage was deleted. (*Id.* at PageID.2643).  Second, Williams cannot show Amazon intentionally destroyed evidence. (*Id.* at PageID.2648).  Third, the deleted video footage is not relevant to Williams' claims. (*Id.* at PageID.2651).

"[A] party to civil litigation has a duty to preserve relevant information, including ESI, when that party has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation." *John B. v. Goetz*, 531 F.3d 448, 459 (citation omitted) (6th Cir. 2008).  Federal Rule of Civil Procedure 37(e) allows a court to impose curative measures if ESI "that should have been preserved . . . is lost because a party failed to take reasonable steps to preserve it" and the ESI otherwise "cannot be restored or replaced through additional discovery."  Rule 37(e) has two tiers of curative measures, both of which are discretionary.  If the court finds that the loss of the information prejudiced another party, it "may order measures no greater than necessary to cure the prejudice." Rule 37(e)(1).  The more severe sanctions under Rule 37(e)(2) apply "only upon [a] finding that the party acted with the intent to deprive another party of the information's use in the litigation."  The available sanctions under Rule 37(e)(2)

include an instruction to the jury that "it may or must presume the information was unfavorable to the party." Rule 37(e)(2)(B).  Here, Williams requested an adverse jury instruction.

A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that there was an obligation to preserve the evidence at the time of destruction; (2) that non-moving party destroyed the records with a culpable state of mind; and (3) "'that the destroyed evidence was relevant to [a] party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Stocker v. United States*, 705 F.3d 225, 235 (6th Cir. 2013) (quoting *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010)).

The Court will deny Williams' request because Williams did not establish the requisite level of culpability.  That is, Williams failed to demonstrate that Amazon intentionally destroyed the video so that she could not rely on it in litigation. Williams theorized that Amazon's "exclusive control" over the footage, in conjunction with its duty to preserve ESI, meant it could have only acted intentionally when it destroyed the footage. (ECF No. 33, PageID.2368–69).  That Amazon preserved stills from the video, but not the video itself, allegedly supports the inference. (*Id.*).

But Amazon retained and produced all of the video footage that Balcueva reviewed and relied on in terminating Williams. (ECF No. 38, PageID.2644; ECF No. 38-2, PageID.2660–61).   It did not destroy footage carte blanche; rather, Amazon kept footage that influenced its decision-making and that it could presume would be relevant to any litigation arising from Williams' termination.   Amazon otherwise destroyed the footage not reviewed by HR pursuant to its fourteen-day retention policy. (ECF No. 38-7, PageID.2703, 2718).   The destruction is a routine part of Amazon's business.   Without more, the Court cannot determine that it was an intentional move to undermine a not-yet-filed lawsuit as opposed to mere negligence.   Thus, the Court will deny the motion for an adverse jury instruction. (ECF No. 33).[2]

## E.      Extension

Amazon moved to extend the expert discovery and challenges-to-experts deadlines. (ECF No. 34).   Williams opposed the motion. (ECF No. 39).   Amazon's reasons for an extension are twofold.   Amazon's rebuttal expert unexpectedly raised

---

[2] Although Amazon did not act intentionally, it may have acted negligently in destroying the video.   Amazon saved still photographs related to Williams' termination.   It could have (and perhaps should have) saved the video footage from which the still photographs were distilled from.   To cure any prejudice against Williams, the Court will permit Williams to explore the subject of Amazon's failure to retain the video at trial.

an issue that might prevent them from serving as an expert in the case,  and Amazon experienced timing issues related to its attorneys' personal schedules. (ECF No.34, PageID.2476–77).  Williams responded that if Amazon were given additional time to find and disclose an expert, Williams would "have to schedule and undergo an IME, a protective order agreed on, Plaintiff's expert has to review Amazon's expert report, conduct depositions of Amazon's experts, potentially retain additional rebuttal experts, and complete any additional expert discovery." (ECF No. 39, PageID.2741).

The Court previously ordered that it would not extend the deadlines further. (ECF No. 29, PageID.295).  The Court will adhere to its previous order.  In doing so, the Court otherwise finds that good cause does not exist to grant the motion. Counsel's own scheduling conflicts, and issues in retaining a rebuttal expert, do not justify additional time.  The parties had through September 25, 2025 for expert discovery and through October 25, 2025 for challenges to experts. (*Id.* at PageID.296).  Given that the case commenced in federal court on August 7, 2023, and that Judge Berg ordered discovery to close initially on December 19, 2024, ample time has passed for expert discovery. (ECF No. 1; ECF No. 12).

* * *

For the reasons given, the Court **ORDERS** that the motion for summary judgment (ECF No. 30) is **GRANTED IN PART AND DENIED IN PART**.

The Court **FURTHER ORDERS** that the motion for adverse presumption or adverse inference jury instruction against Defendant Amazon's spoliation/destruction of evidence (ECF No. 33) is **DENIED**.

The Court **FURTHER ORDERS** that the motion for extension of expert discovery deadlines (ECF No. 34) is **DENIED**.


Dated: May 19, 2026                           s/Robert J. White
                                              Robert J. White
                                              United States District Judge

34